UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ALBERT ALIBERTI and MURIEL ALIBERTI,

                Plaintiffs,

     -against-

TOWN OF BROOKHAVEN, TOWN OF
BROOKHAVEN ZONING BOARD OF
APPEALS, TERRY KARL (in his individual
and official capacity), MARVIN COLSON
(in his individual and official capacity), PAUL M.
DeCHANCE (in his individual and official
capacity), KERRY PERIGUINI (in his individual
and official capacity), EDWARD MORRIS (in
his individual and official capacity), JAMES
WISDOM (in his individual and official capacity)
and MICHAEL SCHAFFER (in his individual
and official capacity),

                Defendants.
-----------------------------------------------------------X

08-CV-5185 (TCP)

**MEMORANDUM
AND ORDER**

PLATT, District Judge.

      Before the Court is defendants' motion for summary judgment on plaintiffs' remaining claim alleging a "class-of-one" equal protection violation.[1] Plaintiffs allege that defendants violated the Equal Protection Clause of the Federal Constitution by treating plaintiffs differently from similarly situated individuals by denying plaintiffs' variance application to subdivide their property and build a new home on one of their lots. Because the Court holds that plaintiffs' proposed comparators are not substantially similar to plaintiffs, defendants' motion is hereby

---

1. Previously, defendants' motion to dismiss plaintiffs' complaint was granted in part. DE 15. Subsequently, defendants' motion to amend their answer was granted to include the defense that plaintiffs' takings claims, brought pursuant to the Federal and New York Constitutions, were not ripe because plaintiffs did not bring a just compensation claim in New York State Court. DE 59. Plaintiffs have now voluntarily dismissed their takings claim. DE 77 at p. 18.

**GRANTED**.

## I. BACKGROUND

**Facts**

In 1959, Albert and Muriel Aliberti ("plaintiffs") acquired a 20,000 square foot parcel of land located at 79 Inwood Avenue, Selden, New York ("parcel one"). Def. 56.1 Stmt. ¶ 1. On August 21, 1964, plaintiffs acquired the adjacent 10,000 square foot parcel ("parcel two"). *Id.* at ¶ 2. Plaintiffs have resided in a one family, two-story 2,100 square foot home on parcel one since 1965. *Id.* at ¶ 3.

On or about December 27, 1988, the Town of Brookhaven rezoned the area in which plaintiffs' property is located from a B-residence zoning to an A-1 residence classification. *Id.* at ¶ 4. Prior to the rezoning, B-residence zoning required a minimum lot size of 10,000 square feet per residential dwelling. *Id.* at ¶ 5. In contrast, the A-1 residence classification requires a minimum lot size of 40,000 square feet per residential dwelling as well as establishing other minimum requirements, including minimum frontage, minimum front yard setbacks, minimum side yard setbacks and minimum total side yards. *Id.* at ¶¶ 6, 7. The new ordinance was passed to protect ground and surface water quality in parts of the Town without sewers as well as to protect and preserve wildlife. *Id.* at ¶ 8. The rezoning was also implemented to limit population growth and increased traffic in the area as well as to reduce the demand on community services such as schools, fire, ambulance and police departments as well as garbage pick-up. *Id.* at ¶ 9. At the time the rezoning took place, the Town was aware that the rezoned areas were already fully or partially developed. One critical intention of the rezoning was to halt land divisions that created lots which lacked the minimum area required to protect ground and surface water quality.

*Id.* at ¶ 10.

Plaintiffs' parcels one and two were deemed nonconforming and substandard under the new ordinance and were merged into one single lot. *Id.* at ¶ 12. Brookhaven Town, however, continued sending plaintiffs two property tax bills, i.e., one for each lot. Plt. 56.1 Ctr. Stmt. ¶ 12. Despite the merge of parcels one and two, the property still measured a total of 30,000 square feet, which fell short of the A-1 Residence zoning requirement of 40,000 square feet. Consequently, after the merge, plaintiffs' property continued to be nonconforming and substandard. Def. 56.1 Stmt. ¶ 13.

In June 2003, the Town's Department of Planning, Environment & Land Management ("PELM") advised plaintiffs that they could not proceed with plans to build a small house on parcel two unless they obtained subdivision approval to divide the now 30,000 square foot parcel into two separate lots. *Id.* at ¶ 14. In or about the summer of 2003, plaintiffs retained Clare C. Leek, an expeditor who was the sole owner of Atlantic Consulting Services at the relevant time, to assist them in applying for land division approval. *Id.* at ¶ 15. Plaintiffs advised Leek that they wanted to build a smaller home on the smaller lot and sell their existing home. *Id.* at ¶ 16. During a meeting with plaintiffs in 2003, Leek advised them that they first needed to obtain a certificate of existing use, which would require a title report, an assessment, survey, town fees and paperwork. *Id.* at ¶ 17.

After the title report was completed, Leek submitted the documentation to the Town and, on or about August 20, 2003, obtained the certificate for existing use. *Id.* at ¶ 18. In or around June 2004, Leek filed with PELM plaintiffs' application seeking a land division to split their property into two parcels to build a smaller house on the 10,000 square foot lot. *Id.* at ¶ 19. By

letter dated October 18, 2004, PELM requested additional information, which plaintiffs submitted. *Id.* at ¶¶ 20, 21.

On May 1, 2006, the Town Planning Board ("Board") held a hearing. On May 11, 2006, the Board issued a letter to plaintiffs advising them that the Board voted to recommend denial of the land division and the reasons for the Board's decision. *Id.* at ¶¶ 22, 23. On May 19, 2006, the Board issued a subsequent letter clarifying the May 11th recommendation. *Id.* at ¶ 24.

Subsequently, on or about July 6, 2006, plaintiffs filed two applications with the ZBA seeking land division approval and variances for plaintiffs' proposed lots. *Id.* at ¶ 25. Their combined applications requested a total of nine area variances which would enable plaintiffs to subdivide their lots and build on the smaller parcel. *Id.* at ¶ 26. Proposed parcel two was a fifty foot lot, meaning that it would be fifty feet wide at the front and generally deficient in terms of total area. *Id.* at ¶ 27. The nine variances requested from the ZBA were as follows:

    Lot One:

        Minimum lot area:        40,000 square feet required; 10,000 square feet proposed, resulting in a 75% variance;

        Minimum road frontage:    175 feet required; 50 feet proposed, resulting in a 71% variance;

        Minimum side yard setback:  25 feet required; 10 feet proposed, resulting in a 60% variance;

        Minimum total side yards:   75 feet required; 20 feet proposed, resulting in a 73% variance.

    Lot Two (existing dwelling):

        Minimum lot area:        40,000 square feet required; 20,000 square feet proposed, resulting in a 50% variance;

| | |
|---|---|
| Minimum road frontage: | 175 feet required; 100 feet proposed, resulting in a 43% variance; |
| Minimum side yard setback: | 25 feet required; 18.1 feet proposed, resulting in a 28% variance; |
| Minimum total side yards: | 75 feet required; 53.2 feet proposed, resulting in a 29% variance; |
| Accessory structure set back from lot line: | 10 feet required, 4.4 feet proposed, resulting in a 56% variance. |

*Id.* at ¶ 28.

Defendants contend that the proposed variances were substantial in that they were collectively numerous and that each sought substantial relaxation of the minimum zoning requirements. *Id.* at ¶ 29. Plaintiffs point out that experts Sal Malguarnera and Clare Leek testified that the Aliberti's requests were insubstantial. Plt. 56.1 Ctr. Stmt. ¶ 29.

To assist the ZBA members with their decision on plaintiffs' application, they asked Thomas Chawner ("Chawner") of the Town Planning Department, who served as planner to the ZBA at the relevant time, to: (1) review plaintiffs' application and file; (2) examine the property; and (3) issue a recommendation. Def. 56.1 Stmt. ¶ 30. Chawner visited plaintiffs' property, performed a site examination and spoke with Albert Aliberti. *Id.* at ¶ 31. Chawner preliminarily advised Aliberti that he did not think there would be a problem before the Board with plaintiffs' application. *Id.* at ¶ 32. Chawner testified that he told Aliberti that he "didn't think there would be any problem" but that he "needed to go back and double-check again." App'x Def., Exh. 35, Tr. Chawner 29:15-17. Albert Aliberti testified that during the July 2006 inspection, Chawner indicated that "he was going to write a positive report." *Id.* at Exh. 33, Tr. A. Aliberti 46:25-

47:2.

Chawner subsequently testified that once he returned to his office and reviewed the Alibertis' file, including the Board's recommendation of denial and other documents, Chawner realized he could not recommend approval given, among other things, the negative impact such approval would have on the neighborhood and the Town's water supply as well as the degrees of the variances requested. Def. 56.1 Stmt. ¶ 33.

On August 2, 2006, the ZBA held a hearing at which plaintiff Albert Aliberti and expeditor Clare Leek presented plaintiffs' application to the ZBA. Leeks stated:

> Since the day the Alipertis [sic] purchased this lot[,] there [sic] intent was to build their retirement home, or possibly use it for a starter home for one of their children. . . . We are asking to develop this on conformance to what exists and for the intent for which it was originally purchased. . . . These people are not before this board to subdivide one parcel and build two houses for profit . . . . If this board sees favorably on this application, Mr. and Mrs. Aliberti will be able to build their small house on Inwood Avenue amongst the neighbors they have grown fond of and they would be able to [be] close to their children and enjoy their grandchildren. . . .

*Id.* at ¶ 34; App'x Def.; Exh. 17, Minutes 77:7-11; 86:5-8; 89:18-20; 90:23-91:6.

Plaintiffs' applications were not decided at the August 2, 2006 ZBA meeting and the chairman moved to put plaintiffs' application on the decision calendar. Def. 56.1 Stmt. ¶ 35. Plaintiffs dispute that the Board further considered plaintiffs' applications because the ZBA's final decision was, in most respects, copied from Chawner's report recommending that the applications be denied. Plt. 56.1 Ctr. Stmt. ¶ 35.

When deciding whether to grant an area variance, the ZBA is required to weigh the benefit to the applicant against the health, safety and welfare of the neighborhood or community if the application was granted. Furthermore, the Board is also required to consider the following

five factors pursuant to town Code § 85-29.1(B)(1):

> (a) Whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created by the granting of the area variance;
>
> (b) Whether the benefit sought by the applicant can be achieved by some method, feasible for the applicant to pursue, other than an area variance;
>
> (c) Whether the requested area variance is substantial;
>
> (d) Whether the proposed variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or district; and
>
> (e) Whether the alleged difficulty was self-created, which consideration shall be relevant to the decision of the Board of Appeals, but shall not necessarily preclude the granting of the area variance.

Def. 56.1 Stmt. ¶ 36. Defendants contend that when considering plaintiffs' applications for the variances, the ZBA carefully considered the foregoing factors. Id. at ¶ 37. Plaintiffs dispute this statement based on the testimony of Board member Marvin Colson, who could not name the five factors or recall their application to plaintiffs' variance request (Dec. Kirchner, Exh. D, Tr. Colson 18:15-21:10); and on Board member James Wisdom's inability to articulate the five factors (App'x Def., Exh. 29, Tr.Wisdom 9:22-24). Plt. 56.1 Ctr. Stmt. ¶ 37.

On September 13, 2006, the ZBA voted to deny plaintiffs' applications for various reasons, including: (1) an undesirable change in the character of the neighborhood, a detriment to nearby properties, and that the grant of these variances would create and have an adverse impact on the physical and environmental conditions in the neighborhood; (2) that it was clear that the subject parcel did not conform to current A-1 Residence zoning criteria and, further, the requirements of the Town Code would require substantial relaxation to grant the proposal; (3) the

proposal would create two substandard lots and result in development in an area even further above what is required under the Town Code for the district; (4) the requested relief was not in conformity with the general character of the neighborhood and creating two lots with development rights would set a negative precedent for future development; (5) the requested relief was substantial, especially when the totality of the large variances the proposal required were considered and because the applicant sought to further subdivide an already substandard parcel; and (6) the hardship to the applicant was self created in that the applicant has reasonable use of the subject parcel with the existing dwelling and several detached sheds. App'x Def., Exh. 7 (Board of Zoning Appeals Findings and Conclusions).

Plaintiffs dispute that the ZBA made these findings because the bulk of the report "was an almost verbatim cut and paste from Brenda Prusinowski's Report dated July 31, 2006 . . . which was authored by Chawner." Plt. 56.1 Ctr. Stmt. ¶ 39.

Defendants DeChance, Karl, Peragine and Wisdom all swore by declaration that in rendering their decision, the ZBA members held and exhibited no malice, animus or intent to injure plaintiffs. Def. 56.1 Stmt. ¶ 40. Plaintiffs respond that they are incapable of knowing the defendants' motives. Plt. 56.1 Ctr. Stmt. ¶ 40. Moreover, there was no animus, malice or hostility exhibited by the community to the application for the requested variances, as evidenced by the fact that plaintiffs submitted a neighborhood petition supporting their land division application. Def. 56.1 Stmt. ¶ 41.

The ZBA's ultimate decision was set forth in its Findings and Conclusions dated September 13, 2006. *Id.* at ¶ 42. Defendants contend that although the Findings and Conclusions correctly "summarized" the general findings and conclusions of the ZBA, it was not

a "comprehensive, all inclusive summary and was not intended to be such." *Id.* at ¶ 43. Plaintiffs dispute defendants' statement based on the fact that nothing in said report refers to the ZBA's findings and conclusions as being a "summary." Plt. 56.1 Ctr. Stmt. ¶ 43.

After the ZBA's September 13, 2006 denial of plaintiffs' application, plaintiffs filed a New York Civil Law and Rules Article 78 petition against the ZBA which sought to overturn the Board's denial of their application. Def. 56.1 Stmt. ¶ 44. Defendants contend that as part of a settlement to resolve the litigation, the ZBA stipulated to withdraw its answer to plaintiffs' Article 78 Petition and consented to the entry of judgment as requested in the petition thereby enabling plaintiffs to obtain the requested variances. *Id.* at ¶ 45. Plaintiffs admit that the ZBA, represented by the Town's attorneys, withdrew its answer to the petition and consented to the entry of judgment, but note that there is no proof in the record that the Town's withdrawal of its answer and grant of the variances to plaintiffs amounted to a "settlement." Plt. 56.1 Ctr. Stmt. ¶ 45.

By Judgment dated December 11, 2007, plaintiffs' petition was granted, the ZBA's determination rendered September 13, 2006 was vacated and annulled and the ZBA was ordered to grant plaintiffs' application for a "two-lot land division of property situate at Inwood Avenue, Selden, New York." The Judgment also ordered that the variances requested by plaintiff "shall also be granted in all respects." App'x Def., Exh. 3 (New York State Supreme Court Judgment). The stipulation submitted with the Judgment states that the parties agree that the ZBA's answer in the Article 78 proceeding "is hereby withdrawn" and that both parties "consent that the proposed Judgment annexed hereto shall be signed by the Court and entered into the office of the County Clerk of Suffolk County." *Id.* (Stipulation filed Dec. 11, 2007). Thus, the Judgment was

not on the merits of plaintiffs' Article 78 petition, nor was there any determination that the ZBA acted arbitrarily or capriciously. Def. 56.1 Stmt. ¶ 47. On January 16, 2008, the ZBA approved plaintiffs' application. *Id.* at ¶ 48.

Plaintiffs did not sue for just compensation in State court, nor did they seek such compensation in their Article 78 petition. *Id.* at ¶ 49. Plaintiffs filed the instant federal suit on December 23, 2008, alleging the following: (1) violation of the Equal Protection Clause; (2) taking without just compensation pursuant to the Fifth Amendment of the United States Constitution; (3) conspiracy to violate plaintiffs' civil rights pursuant to 42 U.S.C. § 1985; (4) denial of Equal Protection of the law under Article I, § 11 of the New York State Constitution; and (5) governmental taking without just compensation under Article I, § 7 of the New York State Constitution. *Id.* at ¶ 50.

Defendants contend that plaintiffs failed to demonstrate that anyone similarly situated to plaintiffs was granted a variance to "subdivide a parcel of property zoned as an A-1 residence to create a new 50 foot [frontage] lot within the 500 foot radius of plaintiffs' property since the rezoning law went into effect in 1988." *Id.* at ¶ 56. Plaintiffs maintain that they have identified similarly situated individuals who were granted variances which allowed them to build on a substandard lot. Plt. 56.1 Ctr. Stmt. ¶ 54.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A motion for summary judgment may not be granted unless a court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(c)).

"Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

There is a "genuine" issue of fact only if the "evidence [presented] is such that a reasonable jury could return a verdict for the nonmoving party." *Giodano v. City of New York*, 274 F.3d 740, 746-47 (2d Cir. 2001). Furthermore, "attempts to twist the record do not create a genuine issue of material fact for a jury." *Kim v. Son*, No. 05 Civ. 1262, 2007 WL 1989473, at *6 (E.D.N.Y. July 9, 2007). Therefore, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001). Also, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Finally, Federal Rule of Civil Procedure 56(c) mandates that all facts

under consideration in a motion for summary judgment be directly supported by proof in admissible form.

**B.  Plaintiffs' Equal Protection Class-of-One Claim**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the law."  U.S. Const. amend. XIV § 1.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Phlyer v. Doe*, 457 U.S. 202, 216 (1982)).  In light of the Clause's purpose to " 'secure every person within the State's jurisdiction against intentional or arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents,' " *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)),  the Supreme Court has recognized that "successful equal protection claims [may be] brought by a 'class of one.' " *Id.*

**1.  Class-of-One Claims and Discretionary Governmental Conduct**

As an initial matter and despite the fact that their argument was the subject of a previously denied motion for reconsideration,[2] the Town contends that plaintiffs' remaining claim must be dismissed as a matter of law because defendants' actions were discretionary.

For this proposition, defendants cite to *Engquist v. Oregon Department of Agriculture*,

---

2. *See* DE 21 (Memorandum and Order denying defendants' motion for reconsideration of Order denying their motion to dismiss at DE 15).

553 U.S. 591 (2008). *Engquist* held that "the class-of-one theory of equal protection has no application in the public employment context."³ *Id.* at 608. The Supreme Court reasoned:

> [T]he class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

*Id.* at 605.

Post *Engquist*, some courts extrapolated the case's holding to bar equal protection class-of-one claims whenever the government's actions were deemed discretionary, irrespective of whether the plaintiff was a government employee or not. *See*, *e.g.*, *Catcove Corp. v. Heaney*, 685 F. Supp. 2d 328, 333 (E.D.N.Y. 2010) ("[P]ost *Engquist*, a plaintiff who proceeds on a class of one claim must allege that 'the differential treatment resulted from non-discretionary state action.'") (quoting *Alfaro v. Labrador*, No. 06 Civ. 1470, 2009 WL 2525128, at *8-9 (E.D.N.Y. Aug. 14, 2009)); *DeFabio v. East Hampton Union Free School Dist.*, 658 F. Supp. 2d 461, 495 (E.D.N.Y. 2009) (holding that the *Engquist* decision "appears to foreclose as a matter of law a 'class-of-one' claim to the discretionary decisions" made by school personnel); *Crippen v. Town of Hempstead*, No. 07 Civ. 3478, 2009 WL 803117, at *6 (E.D.N.Y. Mar. 25, 2009) ("[S]everal courts have applied *Enquist* to bar class-of-one claims in connection with discretionary decisions

---

3. The *Engquist* Court explicitly limited its holding to government employees. 553 U.S. at 607 ("In concluding that the class-of-one theory of equal protection has no application in the public employment context–and that is all we decide–we are guided, as in the past, by the "common sense realization that government offices could not function if every employment decision became a constitutional issue.'") (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)).

that are outside the government-employee context.").

In *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 141 (2d Cir. 2010),[4] however, the Second Circuit Court of Appeals noted that it had "yet to address whether *Enquist's* prohibition is limited to the public employment context, or whether it extends to other types of discretionary government behavior." The court discussed the split amongst its sister Circuits on this issue and, joining the Seventh Circuit Court of Appeals, held that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Id.* at 141-42.

Critical to the Second Circuit's decision was the reasoning underlying the *Engquist's* Court's decision, to wit: a "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.' " *Engquist*, 553 U.S. at 598 (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)); *Analytical Diagnostic*, 626 F.3d at 142. Accordingly, in the wake of *Analytical Diagnostic*, class-of-one claims are not *ipso facto* barred simply because the government's conduct was discretionary. *See Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre*, No. 11 Civ. 617, 2012 WL 1988785, at *3 (M.D. Pa. June 4, 2012) *("Engquist* stands only for the narrow proposition that "the class-of-one theory of equal protection does not apply in the public employment context. . . . The instant case, however, does not involve public employment or the

---

4. In *Analytical Diagnostic*, a privately owned laboratory appealed the district court's dismissal of its class-of-one equal protection claim against certain employees of the New York State Department of Health who, plaintiff alleged, subjected it to intense and unwarranted regulatory scrutiny. 626 F.3d at 137. The district court, citing *Engquist*, held that plaintiff's class-of-one claim was barred because plaintiff could not show that the allegedly disparate treatment resulted from non-discretionary state action. *Id.* The appeals court held that although *Engquist* did not bar plaintiff's claims, it "found nothing in the record that raises a question of fact as to the alleged [intentional] disparate treatment." *Id.* at 143. It therefore affirmed the dismissal of plaintiff's claims albeit on different grounds than the district court. *Id.*

-14-

government's role as proprietor, and thus the reasoning from *Engquist* is not applicable."); *Missere v. Gross*, 826 F. Supp. 2d 542, 560 (S.D.N.Y. 2011) (noting that the Second Circuit rejected an overly broad reading of *Engquist* in *Analytical Diagnostic* based on the Supreme Court distinguishing "between government acting as proprietor and manager of its own operations (e.g., as employer) and government acting as a regulator or lawmaker").

Although, as defendants point out, the *Analytical Diagnostic* court also stated that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," those circumstances do not include cases where the government exercises its regulatory power. 626 F.3d at 142.

With respect to the instant case, this Court previously held that defendants were required to apply certain factors in determining whether or not to grant plaintiffs a variance. It therefore denied defendants' reconsideration motion seeking dismissal of plaintiffs' class-of-one claim on the ground that the government's conduct was discretionary and barred by *Engquist*. DE 21 at pp. 5-6.

The Court's holding remains the same and it further finds that similar to the Department of Health employees in *Analytical Diagnostic*, the Town does not possess unfettered discretion in deciding whether or not to issue a variance because it must take certain steps in determining an application, i.e., give notice and hold hearings. Furthermore, its decisions are appealable. As pointed out in *Analytical Diagnostic*, when an "outcome [may] further be challenged in an Article 78 proceeding," as plaintiffs did in the instant case, the government lacks discretion. *Analytical Diagnostic*, 626 F.3d at 142.

Moreover, given the reasoning in *Analytical Diagnostic*, plaintiffs' claim is not barred by

*Engquist* because plaintiffs were not government employees and the Town was exercising its regulatory power. Accordingly, plaintiffs' class-of-one claim may not be dismissed on the ground that the government's conduct was discretionary.

### 2. Elements of a Class-of-One Claim

"[T]o succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). In *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001), the Second Circuit held that plaintiffs alleging an equal protection class-of-one claim are required to show "not only 'irrational and wholly arbitrary' acts . . . but also *intentional* disparate treatment." (Citations omitted.) "[T]hat is, demonstrate that decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic*, 626 F.3d at 143.

*Substantial Similarity*

With respect to a comparator in a class-of-one case, "a plaintiff must show more than a general similarity between her and the comparator . . . as in cases where discrimination based on membership in a protected class is claimed." *Ferguson v. City of Rochester School Dist.*, 485 F. Supp. 2d 256, 259 (W.D.N.Y. 2007) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000), and noting that in the context of a Title VII race discrimination case, the facts and circumstances between the plaintiff and the comparator need only closely resemble each other,

not be identical). Thus, unlike a discrimination case where differences in the treatment between similar persons raises an inference that an individual from a protected class was impermissibly treated, in a "class-of-one" case:

> [T]he existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain.

*Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *rev'd on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008).

As a result, in order to succeed on a "class of one" claim, "the similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson*, 409 F.3d at 105. *See Clubside*, 468 F.3d at 159 ("We have held that class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) ("In order to succeed, [plaintiffs] must demonstrate that they were treated differently than someone who is *prima facie* identical in all relevant respects."); *Missere v. Gross*, 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011) ("Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.").

"Generally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside*, 468 F.3d at 159. Despite that, a "court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.* (citing *Harlen Assocs. v. Inc.*

*Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)) (noting that although similarity is typically a jury question, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met").

In support of their summary judgment motion on plaintiffs' equal protection claim, defendants argue that plaintiffs have failed to identify similarly situated individuals who were treated differently. They contend that plaintiffs have failed to identify a single comparator within a 500 foot radius of plaintiff who was permitted to subdivide an already nonconforming lot into a 10,000 square foot lot.

Plaintiffs contend that those individuals with 50 foot frontages who were granted approval to build houses similar to what plaintiff planned to build are similarly situated. For this proposition, they cite to lots located at 67 Inwood (lot 64) and 81 Ferndale (lot 100), both of which are within the 500 foot radius of plaintiffs' lot.

Plaintiffs also offer four prior land divisions ("LD"),[5] which they claim are similarly situated to plaintiffs' situation: (1) an LD (numbers 67 and 68 on the radius map) which created two lots with 70 foot and 80 foot frontages of 8,750 square feet each; (2) an LD (numbers 41-43) which created two lots with 75 foot frontages, each with 13,125 square feet; (3) an LD (numbers 6 and 7) which created two lots with 75 foot frontages, each with 11,250 square feet each; and (4) an LD just outside the 500 foot radius which created two lots with 50 foot frontages, each with 7,500 total square footage.

With respect to the prior land divisions, the Court finds they are not substantially similar

---

5. Although it is not entirely clear from the parties' memoranda or from defendants' exhibit 7 (ZBA's Findings and Conclusions dated September 13, 2006), "prior land divisions" appears to refer to land divisions granted prior to the rezoning of the area in 1988.

for the purposes of plaintiffs' class-of-one claim because they are not, as required by the Second Circuit, "virtually identical." First, and significantly, the variances to divide the above parcels were granted prior to the reclassification of plaintiffs' neighborhood from B-residence zoning to A-1 residence. At that time, B-residence zoning required a minimum lot size of 10,000 square feet per residential dwelling as contrasted with the current zoning requiring 40,000 square feet minimum lot size. As defendants point out, with respect to a regulation, "it seems self-evident that to be similarly situated to plaintiff, an individual would at the very least have to be subject to the ordinance." *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 446-47 (W.D.N.Y. 2009) ("If a particular individual is not covered by the ordinance, then the Town's 'failure' to enforce the ordinance against that person would be probative of nothing; there would be nothing to enforce against that person.").

Second, none of the cited prior land divisions resulted in as extreme a departure from the zoning requirements as the departures sought by plaintiffs. That is, the relevant zoning at the time required a minimum lot size of 10,000 square feet. Only one prior land division within the 500 foot radius of plaintiffs' lot created substandard lots, which were 8,750 square feet each amounting to an approximately 13% variance from the requirement. Plaintiffs sought to create a 10,000 square foot lot, which amounted to a 75% variance from the requirement. Thus, none of the LDs offered by plaintiffs are substantially similar.

Nor are lots 64 and 100 similarly situated to plaintiffs. Critically, lots 64 and 100 were already in existence at the time their construction variances were sought. In contrast and in addition to seeking a construction permit for the 10,000 square foot lot, plaintiffs also sought to divide their already substandard lot to create two substandard lots, one requiring a 50% variance

and the other a 75% variance. Consequently, the comparators' lots may not be said to be "virtually identical" to plaintiffs' circumstances in all material respects because if plaintiffs' application was granted, his property would have to be subdivided to create the 10,000 foot lot whereas the other two lots were already in existence.[6] Thus, those lots, for the purposes of an equal protection class-of-one claim, are substantially similar to an individual who had a virtually identically sized lot but was denied a construction variance. Given that, no reasonable jury could find in plaintiffs' favor with respect to their class-of-one claim because there are no substantially similar persons with whom to compare plaintiffs. Accordingly, plaintiffs cannot prove that the government singled them out for different treatment.

### III. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment as to plaintiffs' Equal Protection claim is hereby **GRANTED** and plaintiffs' complaint is dismissed. The Clerk of the Court is hereby directed to close this case.

Dated: June 25, 2012
      Central Islip, New York

                                            /s/
                                      Thomas C. Platt, U.S.D.J.

---

6. Given the nature of plaintiffs' remaining claim and the proof required, whether or not defendants properly denied plaintiffs' application to subdivide the parcels is not at issue. Nor is the propriety or impropriety of the merging of plaintiffs' lots in the first instance.